FILED

Nov 02 2016, 7:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

S. Matthew Cook
Stephen W. Cook
Noblesville, Indiana

ATTORNEYS FOR APPELLEES

Andrew A. Manna
Alexander P. Pinegar
Brent R. Borg
Noblesville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

David McCollough,

*Appellant-Defendant, Cross-Appellee*

v.

Noblesville Schools and Jeff Bryant,

*Appellees-Plaintiffs.*

November 2, 2016

Court of Appeals Case No.
29A02-1512-CT-2181

Appeal from the Hamilton Circuit Court

The Honorable Paul A. Felix, Judge

Trial Court Cause No.
29C01-1409-CT-8761

**Altice, Judge.**

**Case Summary[1]**

---

[1] We heard oral argument in this cause on October 5, 2016, at Clinton Prairie High School. We would like to extend our gratitude to the staff, faculty, and students for their hospitality. We also commend counsel for their excellent written and oral advocacy.

David McCollough filed a complaint against Noblesville Schools and Jeff Bryant, Principal of Noblesville High School (Bryant) (collectively, the Defendants) in which he asserted claims for defamation, intentional infliction of emotional distress, negligence, breach of contract, and tortious interference with a contract/business relationship. McCollough also claimed that his due process rights were violated. The Defendants filed a motion for summary judgment. The trial court held a hearing and thereafter denied summary judgment as to McCollough's defamation claim, but granted summary judgment in favor of the Defendants on all remaining claims. In this interlocutory appeal, McCollough challenges the grant of summary judgment while the Defendants cross-appeal the denial of summary judgment with regard to the defamation claim.

We affirm.

### Facts & Procedural History

McCollough was the head boys basketball coach for Noblesville High School for twenty years, and for each year, he executed and worked under a coaching contract with a fixed term. During basketball practice on January 28, 2014, players were engaged in a drill when McCollough called a foul on one of them. As described by witnesses, the player then threw a basketball more forcefully than appropriate at McCollough. McCollough admits that "out of frustration" he threw the ball back toward the player. *Appellant's Appendix* at 297. Some of those who witnessed the incident indicated that the player reached high for the

ball and the ball grazed his fingertips. Those same witnesses indicated that had the player not reached for the ball, the ball would not have touched the player.

[4] According to McCollough, on January 29, 2014, Bryant notified him that "a disgruntled player . . . had alleged that [McCollough] threw a basketball in the manner of a baseball throw at [him] in anger and intentionally struck [him] in the head with a ball. . . ." *Id*. at 296. McCollough claims that he "promptly denied that [he] ever threw a basketball at any player in the manner of a baseball pass, threw a pass in anger, or ever hit a player in the head or face with a ball." *Id*. According to Bryant, he and McCollough watched a video recording of the incident, which apparently shows that the ball stopped when it reached the player indicating that it did indeed hit the player in some fashion.[2] McCollough did not respond to Bryant's observation, but continued to maintain that he was not aware the ball hit the player. McCollough claims that Bryant stated he would conduct further investigation into the matter.

[5] McCollough asserts that Bryant failed to conduct a thorough investigation in that he did not interview witnesses to the incident. Rather, McCollough claims that Bryant relied solely on the information conveyed to him by the basketball player. McCollough further claims that Bryant led administrators and others to believe that he had conducted a thorough investigation, including interviewing players and assistant coaches who were present and/or witnessed the incident.

---

[2] The video itself was not designated as evidence for purposes of summary judgment.

Bryant, on the other hand, asserts that given McCollough's admission that he threw a ball toward the player and a player's description of what occurred, there was sufficient evidence to inform him of what had transpired and thus, no further investigation was necessary.

On January 31, 2014, Bryant advised McCollough that he was being placed on administrative leave for five days as a result of the incident. McCollough was also asked to attend a press conference on the morning of February 1, 2014, to address the incident involving the player. He could not attend however because he became physically ill as a result of the suspension. Instead, McCollough agreed to work with a public relations director for Noblesville Schools to draft a statement that would be released to the public. The statement to which McCollough agreed provides:

> An incident occurred at basketball practice earlier this week in which, out of frustration during a drill, I threw a basketball and the ball *allegedly* hit a player. My actions were unacceptable, and I greatly regret that I allowed this to happen. I am sorry and publicly apologize to my players, families, and fans. This is not the behavior that I want to model for my players, and it will not happen again.

*Id*. at 297 (emphasis supplied). Later that day, Noblesville Schools sent the above statement to media outlets in Central Indiana and elsewhere. However, the word "allegedly", which McCollough claims he was adamant about including, had been removed without McCollough's knowledge or consent. McCollough maintains that the word "allegedly" was removed at the direction

of Bryant[3] and that its removal completely changed the meaning of McCollough's statement such that it read as an admission by McCollough to hitting a player with a basketball.

[7] On February 4, 2014, McCollough was called into a meeting with Bryant and an assistant superintendent and was instructed to sign a memo, the substance of which McCollough claims he did not agree with.[4] McCollough maintains that he was told that his signature was required before he could return to teaching and coaching the basketball team. McCollough asserts that he signed the memo as an acknowledgment of what was alleged and with the further understanding that he could submit a letter for his file that contained his version of events. On February 18, 2014, McCollough did just that and submitted to Noblesville Schools a "[s]tatement for file - to be attached to signed paper from suspension letter" that set forth his version of what transpired during practice on January 28, 2014. *Id.* at 76.

[8] McCollough's written contract for his position as the head basketball coach expired by its own terms on March 24, 2014. After that date, McCollough maintains that he continued to act as the head basketball coach as he had done for the previous nineteen years by identifying himself as the head coach,

---

[3] McCollough directs us to the deposition of the public relations director in which she states that Bryant, although not explicitly, "made it very clear" that he wanted the word allegedly removed from McCollough's statement. *Id.* at 184. In contrast, Bryant maintains that he never told the public relations director to remove the word allegedly from McCollough's statement.

[4] The memo provided that McCollough "threw a ball at a student/athlete in a state of anger" and that "[t]he ball hit the student/athlete." *Id.* at 302.

corresponding with others in his capacity as head coach, working with returning players, and talking to college basketball coaches and scouts. McCollough also notes that at a school board meeting on April 15, 2014, he was introduced as the head coach of the boys basketball team.

On April 16, 2014, Bryant handed McCollough a letter that informed McCollough that he was not being recommended for the head coaching position for the following school year. McCollough claims that he appealed the decision in writing and asked the Noblesville School Board to review the matter. However, a hearing was never held. Thereafter, McCollough claims that he applied for approximately thirty-one basketball coaching positions at high schools and colleges around Indiana. McCollough asserts that the main reason he did not receive any of the coaching positions is directly related to the public statement issued by Noblesville Schools that read as an admission by him to throwing a ball at and hitting a player.

On September 4, 2014, McCollough filed his complaint against the Defendants, asserting claims for defamation, intentional infliction of emotional distress, negligence, breach of contract, and tortious interference with a contract/business relationship.[5] McCollough also claimed the Defendants violated his due process rights. On December 22, 2014, the Defendants filed a motion for summary judgment. The trial court held a hearing on October 29,

---

[5] McCollough had previously filed a timely tort claim notice.

2015, and issued its order on November 17, 2015, granting the Defendants'
motion for summary judgment as to all of McCollough's claims except for
defamation. McCollough filed a motion to reconsider or in the alternative a
motion to certify the court's summary judgment order for interlocutory appeal.
After a hearing, the trial court denied the motion to reconsider, but granted the
request for certification. This court accepted jurisdiction on February 1, 2016.

## Discussion & Decision

In this interlocutory appeal, we are asked to consider the appropriateness of the
trial court's summary judgment ruling. We begin by noting that Indiana
follows a heightened summary judgment standard. As our Supreme Court has
recently recognized:

> Summary judgment "is a desirable tool to allow the trial court to
> dispose of cases where only legal issues exist." But it is also a
> "blunt ... instrument" by which "the non-prevailing party is
> prevented from having his day in court". We have therefore
> cautioned that summary judgment "is not a summary trial"; and
> the Court of Appeals has often rightly observed that it "is not
> appropriate merely because the non-movant appears unlikely to
> prevail at trial." In essence, Indiana consciously errs on the side
> of letting marginal cases proceed to trial on the merits, rather
> than risk short-circuiting meritorious claims.

*Hughley v. State*, 15 N.E.3d 1000, 1003-04 (Ind. 2014) (citations omitted).

Summary judgment is appropriate if, after reviewing the designated evidence,
"there is no genuine issue as to any material fact and ... the moving party is
entitled to a judgment as a matter of law." T.R. 56(C). A fact is material if its

resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences. *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009). When the trial court has granted summary judgment, the nonmoving party has the burden on appeal of persuading us that the grant of summary judgment was in error. *Adams v. ArvinMeritor, Inc.*, 48 N.E.3d 1, 9 (Ind. Ct. App. 2015). We review an order granting summary judgment de novo. *Id.*

## Intentional Infliction of Emotional Distress

[13]     The tort of intentional infliction of emotional distress (IIED) occurs when the defendant "(1) engages in extreme and outrageous conduct (2) which intentionally or recklessly (3) causes (4) severe emotional distress to another." *Bah v. Mac's Convenience Stores, LLC*, 37 N.E.3d 539, 549 (Ind. Ct. App. 2015) (quoting *Curry v. Whitaker*, 943 N.E.2d 354, 361 (Ind. Ct. App. 2011)), *trans. denied*. The requirements to prove this tort are rigorous, and at its foundation is "the intent to harm the plaintiff emotionally." *Id.* at 550. As often quoted from Comment (d) of the Restatement (Second) of Torts Section 46 (1965),

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

[14] *Id.* The question of what amounts to extreme and outrageous conduct depends in part on prevailing cultural norms and values, and "[i]n the appropriate case, the question can be decided as a matter of law." *Id.* This is the case here.

[15] McCollough argues that Bryant's conduct in failing to thoroughly investigate the incident, leading others to believe that he had fully investigated the incident when he had not, and in directing that McCollough's statement be altered so that it read as a purported admission by McCollough was outrageous, or at the very least, is a matter to be determined by the trier of fact. He also points to Noblesville Schools and argues that its intentional publication of an altered statement that was attributed to McCollough as an admission that he hit a player with a ball, an allegation that McCollough adamantly denied, was extreme and outrageous conduct.

[16] We agree with the Defendants that even accepting the facts as presented by McCollough, we cannot say that the Defendants' conduct, even if intentional, qualifies as being so outrageous in character or extreme in degree that it is to be regarded as atrocious or utterly intolerable in a civilized community. *See Jaffri v. JPMorgan Chase Bank, N.A.*, 26 N.E.3d 635, 640 (Ind. Ct. App. 2015) (holding

that even assuming defendant intentionally mishandled mortgage-related documents, such conduct is not "the type of beyond-the-pale, 'outrageous' conduct that may be covered by an IIED claim"); *cf. Mitchell v. Stevenson*, 677 N.E.2d 551 (Ind. Ct. App. 1997) (holding that evidence that decedent's second wife secretly decided to disinter decedent's remains rather than maintain a grave with a headstone pursuant to an agreement with family members sufficiently established that wife's actions were deliberate and extreme and outrageous for purposes of establishing an IIED claim), *trans. denied*. Because we conclude as a matter of law that McCollough cannot establish the Defendants engaged in extreme and outrageous conduct, we need not address McCollough's claims regarding the other elements of his IIED claim. The trial court did not err in granting summary judgment in favor of the Defendants on McCollough's IIED claim.

## Breach of Contract

[17]   McCollough argues that the trial court erred in granting summary judgment on his claim for breach of contract. The essential elements of a breach of contract claim are the existence of a contract, the defendant's breach of the contract, and damages. *Murat Temple Ass'n, Inc. v. Live Nation Worldwide, Inc.*, 953 N.E.2d 1125, 1128-29 (Ind. Ct. App. 2011), *trans. denied*. It is undisputed that McCollough's coaching contract was a term contract that expired by its own terms on March 24, 2014. McCollough nevertheless argues that his tenure as head basketball coach continued after March 24, 2014, under an implied contract, which McCollough claims indicates the intentions of the parties that

he would be awarded a new term coaching contract for the following season. McCollough relies on the following:

> A contract implied in fact derives from the 'presumed' intention of the parties as indicated by their conduct. When an agreement expires by its terms, if, without more, the parties continue to perform as theretofore, an implication arises that they have mutually assented to a new contract containing the same provisions as the old. Ordinarily, the existence of such a new contract is determined by the 'objective' test, i.e., whether a reasonable man would think the parties intended to make such a new binding agreement—whether they acted as if they so intended.

[18] *JKL Components Corp. v. Insul-Reps, Inc.*, 596 N.E.2d 945, 951 (Ind. Ct. App. 1992) (quoting *Martin v. Campanaro*, 156 F.2d 127, 129 (2nd Cir. 1946)), *trans. denied.* McCollough maintains that even after the term of his coaching contract expired, he continued to act as head coach in the same manner as he had during each of the previous nineteen years, and each time, he was presented with a new term coaching contract. McCollough also notes that he was even acknowledged as head coach by the school board after his coaching contract had expired and asserts that he continued working with players, speaking with college coaches, and using stationery that identified him as head coach, among other coaching duties, after March 24.

[19] We begin by addressing the applicability of *JKL Components*, the case upon which McCollough relies. In that case, the court was asked to consider the existence of an implied contract under California law. Further, the facts in that

case are inapposite to the case before us. In *JKL Components*, the parties were unaware that the term of the contract had ended and yet each acted as if the written contract was still in effect. Under these circumstances, we held that the trial court correctly determined an implied contract existed between the parties. Here, however, all parties were aware that the coaching contract was a term contract and that it expired on March 24, 2014.

[20] Although not directly on point, we find *Vincennes Univ. v. Sparks*, 988 N.E.2d 1160 (Ind. Ct. App. 2013), instructive. In *Sparks*, the basketball coach was investigated for falsifying information on a basketball recruit's application. In lieu of facing disciplinary proceedings, the coach agreed to forfeit his tenure and be subject to a zero-tolerance policy. The university manual provided that a faculty member who forfeited tenure was then employed on a year-to-year contract and the university was free to renew or not renew the contract each year as it saw fit. The coach also signed a contract "for a period commencing on August 15, 2004, and ending on May 15, 2005." *Id.* at 1167. At the conclusion of the 2004-2005 academic year, the coach was notified that his contract would not be renewed for the following academic year. There was no allegation that the coach had violated the zero-tolerance policy. This court was reluctant to infer a promise of continued employment that was not clearly expressed in the contract. *See Sparks*, 988 N.E.2d at 1167 (citing *Orem v. Ivy Tech State College*, 711 N.E.2d 864, 871 (Ind. Ct. App. 1999), *trans. denied*). Thus, looking to the university's policy and the defined term of Sparks's written

contract, the court concluded that Sparks had no reasonable expectation of continued employment after the term of his contract expired. *Id.* at 1168.

[21] Here, McCollough's coaching contracts for the nineteen years preceding the 2013-2014 season were term contracts with a defined start and end date. Indeed, the coaching contract at issue expired by its own terms on March 24, 2014. None of the coaching contracts contained a promise of continued employment beyond the expiration of the term. Even if we accept McCollough's claim that he continued as head coach under an implied contract after March 24, 2014,[6] McCollough has not established that such implied contract contained a promise that he would be retained as head coach for the next season. As in *Sparks, supra*, we will not infer a promise of continued employment that was not clearly expressed in the contract, express or implied. We therefore conclude that the trial court did not err in granting summary judgment on McCollough's breach of contract claim.

## Tortious Interference with a Business/Contract Relationship

[22] The elements of tortious interference with a business relationship are: (1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from

---

[6] Presumably, McCollough would then continue to act as the head coach of the basketball team under an implied contract until such time as he was presented with and executed a term contract for the following season.

defendant's wrongful interference with the relationship. *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 598 n.21 (Ind. 2001) (citing *Levee v. Beeching*, 729 N.E.2d 215, 222 (Ind. Ct. App. 2000)). Additionally, our Supreme Court has held that "this tort requires some independent illegal action." *Brazauskas v. Fort Wayne–South Bend Diocese, Inc.*, 796 N.E.2d 286, 291 (Ind. 2003). Defamation, however, "does not constitute illegal conduct for the purpose of determining whether one tortiously interfered with the business relationship of another." *Miller v. Cent. Ind. Cmty. Found., Inc.*, 11 N.E.3d 944, 961 (Ind. Ct. App. 2014). The elements of an action for tortious interference with a contract are the same as the elements for interference with a business relationship except that there is a requirement for a valid and enforceable contract. *See Levee*, 729 N.E.2d at 221.

[23] McCollough's tortious interference claim is two-fold. First, he argues that Bryant interfered with his business and contractual relationship with Noblesville Schools. Specifically, McCollough asserts that Bryant interfered with his status as head coach by failing to thoroughly investigate the incident that McCollough claims led to his firing. In his second claim, McCollough argues that the Defendants tortiously interfered with his business and contractual relationship with the thirty-one schools to which he applied for a coaching position. McCollough maintains that the primary reason he was passed over for such positions was due to his purported admission to hitting a player with a ball that came about after Bryant directed that McCollough's statement be altered before being published by Noblesville Schools.

[24] With regard to McCollough's claims of tortious interference with a business relationship, McCollough has not alleged any independent illegal action on Bryant's part. As noted above, even assuming Bryant's conduct is deemed to constitute defamation, such does not satisfy this element of a claim for tortious interference with a business relationship. This claim therefore fails as a matter of law and the trial court did not err in granting summary judgment in favor of the Defendants.

[25] Turning to McCollough's claims of tortious interference with a contract, McCollough must establish that a valid contract exists. With respect to his interference claim involving Noblesville Schools, it is undisputed that McCollough's coaching contract was a term contract that expired by its own terms on March 24, 2014. Moreover, as we concluded above, McCollough was never promised continued employment as the head boys basketball coach in a written contract or an implied contract if, in fact, one existed. Thus, the fact that McCollough was not retained as the coach for the following year was not the result of interference with a valid and enforceable contract that provided him with a promise of continued employment. Likewise, McCollough's interference claim involving the thirty-one schools at which he applied for a coaching position fails because McCollough cannot satisfy the element that a valid and enforceable contract existed between him and any one of the thirty-one schools. The trial court therefore did not err in granting summary judgment on McCollough's claims of tortious interference with a business relationship and/or contract.

**Negligence**

Negligence requires a plaintiff to prove (1) that the defendant owed the plaintiff a legal duty; (2) that the defendant breached the duty, and (3) that the plaintiff's injury was proximately caused by the breach. *Jeffrey v. Okolocha*, 972 N.E.2d 941, 945 (Ind. Ct. App. 2012). McCollough argues that the trial court erred in granting summary judgment on his negligence claim, which is based on his claim that the Defendants failed to adequately investigate the incident. McCollough's claim in this regard is based on an assumption-of-duty theory, which he contends presents a question of fact. Indeed, McCollough argues that Bryant expressly assumed a duty to investigate by telling McCullough and members of the administration that he was going to investigate the matter. McCollough maintains that Bryant breached his duty by failing to interview any of the witnesses, including coaches and students, present during the incident at issue. The Defendants maintain that there can be no assumption of duty under the circumstances because the assumption of duty doctrine applies only in instances where there is a risk of physical harm.

[26] Our Supreme Court has elaborated on the concept of assumption of duty:

> [A] duty may be imposed upon one who by affirmative conduct . . . assumes to act, even gratuitously, for another to exercise care and skill in what he has undertaken. It is apparent that the actor must specifically undertake to perform the task he is charged with having performed negligently, for without actual assumption of the undertaking there can be no correlative legal duty to perform the undertaking carefully.

*South Shore Baseball, LLC v. DeJesus*, 11 N.E.3d 903, 910 (Ind. 2014). In addition, our Supreme Court has adopted the language of The Restatement (Third) of Torts section 42, which provides:

> An actor who undertakes to render services to another and who knows or should know that the services will reduce the risk of physical harm to the other has a duty of reasonable care to the other in conducting the undertaking if:
>
> (a) the failure to exercise such care increases the risk of harm beyond that which existed without the undertaking, or
>
> (b) the person to whom the services are rendered or another relies on the actor's exercising reasonable care in the undertaking.

*See id.* Where there is no duty, there can be no breach, and thus the party cannot be found negligent. *Yost v. Wabash College*, 3 N.E.3d 509, 515 (Ind. 2014).

[27] We have found no cases that support McCollough's position that the assumption of duty doctrine applies in the instant case. The alleged assumed duty was a duty to investigate the incident between McCollough and the player. Here, the duty to investigate was not tied to an undertaking of services to reduce the risk of physical harm to McCollough. We decline to extend the assumption of duty doctrine to situations involving non-physical harm, such as harm to one's reputation. The trial court did not err in granting summary judgment in favor of Bryant on McCollough's negligence claim.

## Due Process

McCollough argues that "[s]ome of the facts relating to [his] negligence claim also support his claim under 42 U.S.C. § 1983." *Appellant's Brief* at 28. Specifically, McCollough claims that he was denied his right to due process as a result of Bryant's failure to conduct a reasonable investigation and Bryant's failure to accurately report to school administrators regarding the incident. McCollough, however, does not develop his due process claim with cogent argument or cite relevant authority. He has therefore waived this issue for our review. *See Loomis v. Ameritech Corp.*, 764 N.E.2d 658, 668 (Ind. Ct. App. 2002), *trans. denied*; Ind. Appellate Rule 46(A)(8)(a).

## Cross-Appeal: Defamation

The Defendants cross-appeal and argue that the trial court erred in denying their motion for summary judgment on McCollough's claim for defamation. In order to establish a claim of defamation, a plaintiff must prove (1) a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages. *Dugan v. Mittal Steel USA Inc.*, 929 N.E.2d 184, 186 (Ind. 2010). The first two elements are at issue here.

The Defendants concede that McCollough's statement was revised without his knowledge and consent such that the word "allegedly" was removed and that the revised statement, which was clearly attributed to McCollough, was published in a press release. Notwithstanding their alteration of McCollough's statement, the Defendants argue that McCollough cannot establish a defamatory imputation or that they acted with malice in publishing the revised

statement. In response, McCollough argues that the published statement clearly lowered his reputation in the community and that there is at least a question of fact as to whether the Defendants acted with malice.

*Defamatory Imputation*

[31] Defendants argue that the published statement is incapable of defamatory meaning. A statement is defamatory if it tends "to harm a person's reputation by lowering the person in the community's estimation or deterring third persons from dealing or associating with the person." *Kelley v. Tanoos*, 865 N.E.2d 593, 596 (Ind. 2007). Initially, the determination of whether a communication is defamatory is a question of law for the court. *N. Ind. Pub. Serv. Co. v. Dabagia*, 721 N.E.2d 294, 301 (Ind. Ct. App. 1999). The issue becomes a question of fact only if the statement can reasonably be interpreted as having either a defamatory or non-defamatory meaning. *Id*.

[32] The Defendants point to McCollough's admissions in his statement that he threw a ball toward a player out of frustration, that his behavior was unacceptable and not the type he wanted to model, and that he wanted to publicly apologize. They assert that such admissions do more to harm his reputation in the community than "a misquote that boils down to whether he had bad aim" and actually hit the player. *Appellees' Brief* a 31.

[33] McCollough, on the other hand, asserts that he was adamant about using the word allegedly in his statement because of the meaning it conveyed. Indeed, as he has throughout, McCollough denies that he hit a player with a ball and the

word allegedly conveyed his version of the incident. McCollough argues that removal of "allegedly" from his statement "conveyed a completely different meaning to the average person" in that the revised statement read as an admission by him that he hit a player with a ball. *McCollough's Brief in Response to Cross-Appeal* at 10.

[34] The parties' arguments demonstrate quite clearly that there is a genuine issue of material fact as to the defamatory imputation of the altered statement that was published. The true implication of the statement necessarily requires consideration of extrinsic evidence by the trier of fact.

[35] The Defendants also argue that the statement cannot be defamatory because it accurately states what occurred. *See Gatto v. St. Richard School, Inc.*, 774 N.E.2d 914, 924 (Ind. Ct. App. 2002) (holding that truth is a complete defense to defamation). They point to affidavits of witnesses who stated that the player toward whom McCollough threw the ball outstretched his arm and the ball grazed his fingertips and thus, assert there is no dispute that the ball hit the player, regardless of what McCollough believed. McCollough continues to deny that the ball hit the player. Having reviewed the record, we find that the issue is not so much whether the ball hit the player, but the manner in which it hit the player. Although this distinction is subtle, we conclude that the accuracy of the statement is an issue for the trier of fact to decide in light of the circumstances. Use of the word "allegedly" went to the heart of this issue.

Based on the forgoing, we conclude that the extent, if any, to which the alteration impacted the defamatory nature of the McCollough's statement is a genuine issue of material fact to be decided by the trier of fact.

*Malice*

Both a public figure and a private individual bringing a defamation action over a matter of public or general concern must prove by clear and convincing evidence that the defendant made the alleged defamatory statement with "actual malice." *Journal–Gazette Co. v. Bandido's, Inc.,* 712 N.E.2d 446, 452 (Ind. 1999). The actual malice element required by the United States Supreme Court and our state courts is not to be confused with the ordinary definition of "malice" as "an evil intent or motive" arising from spite or ill will. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991). Actual malice, as an element of the tort of defamation, exists when the defendant publishes a defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *Bandido's*, 712 N.E.2d at 456.

The Defendants argue that no reasonable inference can be drawn that Bryant harbored ill will toward McCollough based on an incident between the two that occurred ten years earlier when Bryant was a basketball coach under McCollough or a separate incident involving Bryant and another individual Bryant never knew was friends with McCollough. McCollough argues that malice is implicit in the fact that the Defendants knowingly or with reckless

disregard of whether it was false published McCollough's statement. Indeed, the Defendants acknowledge that McCollough's statement was changed without his knowledge or permission in order to convey the incident as they saw fit. The alteration changed the meaning of what McCollough intended to convey. We find that the designated evidence presents a genuine issue of fact as to whether the Defendants acted with malice.

*Common Interest Privilege*

[39]   Insofar as they relate to the defamation claim, the Defendants argue that their communications regarding the incident in question are protected by the common interest privilege. This privilege applies to "communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." *Kelly*, 865 N.E.2d at 597 (quoting *Bals v. Verduzco*, 600 N.E.2d 1353, 1356 (Ind. 1992)). The privilege arises out of the necessity for full and unrestricted communication on matters in which the parties have a common interest or duty. *Chambers v. Am. Trans. Air, Inc.*, 577 N.E.2d 612, 615 (Ind. Ct. App. 1991). Application of the privilege is a question of law. *Id*. If the privilege applies, it can be disregarded upon a showing by the plaintiff of "abuse," which is demonstrated in one of three ways: (1) the communicator was primarily motivated by ill will; (2) the communication was published excessively; or (3) the communication was made without belief or grounds for belief in its truth. *Schrader v. Eli Lilly and Co.*, 639 N.E.2d 258, 262 (Ind. 1994).

The Defendants argue that they have an interest in communicating with parents, the local media, and other community members about the conduct of its coaches. *See Gatto v. St. Richard Sch., Inc.*, 774 N.E.2d 914, 925, 26 (Ind. Ct. App. 2002) (recognizing a subset of the common interest privilege as "[p]arents and schools have a 'corresponding interest' in the free flow of information about administrators and faculty members"). In other words, the Defendants maintain that they have an obligation to tell the community and other stakeholders about the incident between McCullough and a player. Further, the Defendants again note their position that the altered statement with the word "allegedly" removed was an accurate account of what occurred. The Defendants assert that McCollough has failed to present any evidence from which an inference of abuse can be made.

In response, McCollough argues that the Defendants cannot assert the common interest privilege so as to defeat his defamation claim. McCollough first notes his continued denial that the ball hit the player. Further, McCollough asserts that the Defendants published a statement that had been revised without McCollough's knowledge or permission and that the altered statement attributed to McCollough an admission to hitting a player with a basketball. McCollough maintains that the statement had a fundamentally different meaning without the word "allegedly." McCollough also argues that the common interest privilege exists only for the purposes of communicating the facts to persons who need to know. McCollough asserts that an area-wide press

release containing the purported admission by him was excessive and published to more individuals than needed to know.

[42] We begin by noting that the Defendants cited no authority to support expansion of the common interest privilege to cover communications between schools and the general public regarding coaching staff. We further disagree with Defendants' contention that simply because "high school basketball reaches its zenith in the Hoosier state," important stakeholders include the media. *Defendants' Brief in Reply and in Support of Cross-Appeal* at 37. The Defendants have not demonstrated that in the present case, there is a corresponding interest or duty between them or the media and general public. In a situation such as this, the corresponding duty for unrestricted communication would more appropriately be between the Defendants and the players and their parents and/or guardians.

[43] This notion carries over to the scope of the publication. We agree with McCollough that communication with the general public and media outlets was excessive. The Defendants cannot assert the common interest privilege as a defense to McCollough's defamation claim.

[44] In summary, we conclude that the trial court properly granted summary judgment in favor of the Defendants on McCollough's claims for IIED, breach of contract, tortious interference with a business relationship/contract, and negligence. We also conclude that the trial court properly denied the

Defendants' motion for summary judgment with respect to McCollough's defamation claim.

[45] Judgment affirmed.

[46] Riley, J. and Bradford, J., concur.