# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 16 2017, 5:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Elden E. Stoops, Jr.
Law Offices of Elden E. Stoops, Jr.
North Manchester, Indiana

ATTORNEYS FOR APPELLEE

Emily C. Guenin-Hodson
Mark C. Guenin
Guenin Law Office, P.C.
Wabash, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jack Allen Delauter,

*Appellant-Respondent,*

v.

Angela Lee Delauter,

*Appellee-Petitioner.*

June 16, 2017

Court of Appeals Case No.
85A02-1611-DR-2644

Appeal from the Wabash Superior Court.
The Honorable Jeffrey R. Heffelfinger, Special Judge.
Cause No. 85D01-1303-DR-151

**Friedlander, Senior Judge**

[1] Jack Allen Delauter appeals the trial court's findings of fact and judgment dissolving his marriage to Angela Lee Delauter. We affirm in part, reverse in part, and remand.

[2] Jack and Angela married in 1989 and had two children during the marriage. At the time of the evidentiary hearing, one child was an emancipated adult and the

other was close to turning eighteen years of age. This appeal does not present any issues of child custody, support, or visitation.

[3] When the parties married, Jack worked at Ford Meter Box, Inc., in Wabash, Indiana. Angela painted home interiors. Jack and his partner, Aaron Shaw, founded North Central Respiratory, Inc. (NCR) in 2001. Angela's sister also worked for the company and held a five percent interest in NCR until 2012. The company, which is an S-corporation, sells home respiratory equipment such as nebulizers, oxygen tanks, and sleep apnea products.

[4] In 2004, Jack quit his job at Ford Meter Box to work for NCR. He managed personnel and operations while Shaw managed sales. During NCR's early days, Angela cut back on her work to focus on being the primary caregiver for the parties' young children while Jack focused on NCR. Angela continued to work, but her income provided for basics such as food and gas. Angela received inheritances from her grandmother and mother, which she contributed to NCR's early expenses and to keeping the marital household running.

[5] NCR eventually turned a profit. Jack received a salary of $110,000 plus annual dividends, which changed from year to year based on corporate revenue and taxes. He conceded "there are times when dividends are paid out solely for the purpose of taking that money and paying it to the IRS or to the Department of Revenue." Tr. Vol. II, p. 138. In addition, Jack and Shaw co-owned NCR's office building and received rent payments from NCR. Jack and Shaw each took out a $100,000 loan from NCR to start a second health care business in

South Carolina. The business failed, but Jack effectively repaid NCR in 2013 through "accounting adjustments" on NCR's books. Tr. Vol. III, p. 4.

[6] Jack managed his and Angela's finances during the marriage. He picked up their financial documents at the mailbox and took them to his office. Angela did not know what Jack earned on a year-to-year basis.

[7] In early 2011, Angela was diagnosed with breast cancer. She had to travel to Fort Wayne for treatments on a regular basis. Her health and her regular trips to Fort Wayne limited her ability to work for several years.

[8] The parties separated on February 22, 2013. Angela filed a petition for dissolution on March 5, 2013. She also filed a petition for expert expenses as the case proceeded. During a hearing, the parties reached an agreement that Jack would pay a set fee for Angela's expert witness to evaluate Jack's share in NCR.

[9] During the separation, Angela lived in the marital home, which was located on nine and a half acres and had a pond. She was responsible for maintaining the home and related equipment, and she had to repair a lawn mower and a water pump for the pond.

[10] Jack continued to pay the mortgage for the marital home and other expenses, but the bills went directly to Jack and Angela did not know what they were or what he was paying. When Angela was unable to work due to medical issues, money was tight and she "needed help" to pay for food and living expenses.

Tr. Vol. II, p. 73. She had access to a checking account, but on several occasions she encountered unexpected medical and home maintenance bills and had to tap into a home equity line of credit. Angela continued her painting and wallpapering business during the separation and started a second business offering art classes with wine, but her health challenges limited her work. In 2013, she reported a net loss of eleven dollars for her painting business.

[11] In the spring of 2015, while the divorce was pending, Jack approached Angela about amending their tax filings for 2012 and 2013 because, due to changes in NCR accounts and monies paid to Jack, they would receive larger tax refunds for those years. They agreed to split the refunds equally.

[12] After an evidentiary hearing, the trial court issued detailed findings and conclusions[1] determining, in relevant part: (1) NCR is valued at $1,697,745, so Jack's one-half share, which is a marital asset, has a fair market value of $848,872; (2) Jack's one-half share of ownership in NCR's office building was a marital assert worth $62,000; (3) Jack owed Angela $17,225.95 to fully compensate her for her share of the parties' tax refunds for 2012, 2013, and 2014; (4) a motorcycle that Jack had purportedly transferred to the parties' son prior to the parties' separation was, in fact, part of the marital pot; and (5) a

---

[1] We thank the special judge for preparing detailed findings and conclusions, which greatly assisted our review.

sixty/forty split of the marital estate in favor of Angela was appropriate. This appeal followed.

[13] The trial court issued special findings of fact and conclusions thereon at Angela's request. In such a circumstance, a court on appeal "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52. We apply a two-tiered standard of review by first determining whether the evidence supports the findings and then whether the findings support the judgment. *Weigel v. Weigel*, 24 N.E.3d 1007 (Ind. Ct. App. 2015). Findings of fact are clearly erroneous only when they have no factual support in the record. *Wysocki v. Johnson*, 18 N.E.3d 600 (Ind. 2014). Per Trial Rule 52, we must defer to the trial court's ability to assess the credibility of witnesses and will not reweigh the evidence. *Crider v. Crider*, 15 N.E.3d 1042 (Ind. Ct. App. 2014), *trans. denied*. Thus, we consider only the evidence most favorable to the judgment along with all reasonable inferences in favor of the judgment. *Id.*

[14] When dividing marital property, a court must first determine what property must be included in the marital estate. *Thompson v. Thompson*, 811 N.E.2d 888 (Ind. Ct. App. 2004), *trans. denied*. Included within the marital estate is all the property acquired by the joint effort of the parties. *Id.*

[15] Once a trial court has determined what is included in the marital estate, the court must value the assets and divide them. We review the trial court's

valuation of an asset in a marriage dissolution for an abuse of discretion. *Weigel*, 24 N.E.3d 1007. There is no abuse of discretion where sufficient evidence and reasonable inferences support the trial court's valuation. *Id.*

[16] Courts are required by statute to presume that an equal division of the marital estate "is just and reasonable." Ind. Code § 31-15-7-5 (1997). The presumption may be rebutted by a party that presents evidence that an equal division would not be just and reasonable. *Id.* A court that is asked to impose an unequal division of the marital estate must consider the following factors, among others:

> (1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.
>
> (2) The extent to which the property was acquired by each spouse:
>
> (A) before the marriage; or
>
> (B) through inheritance or gift.
>
> (3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.
>
> (4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.
>
> (5) The earnings or earning ability of the parties as related to:
>
> (A) a final division of property; and
>
> (B) a final determination of the property rights of the parties.

*Id.*

[17] The division of marital property is a matter committed to the sound discretion of the trial court. *Priore v. Priore*, 65 N.E.3d 1065 (Ind. Ct. App. 2016)*, trans. denied*. A party challenging the trial court's division of marital property must overcome a strong presumption that the court considered and complied with Indiana Code section 31-15-7-5. *Id.* The trial court is not required to explicitly address each factor, but a reviewing court must be able to infer from the trial court's findings that all the statutory factors were considered. *Love v. Love*, 10 N.E.3d 1005 (Ind. Ct. App. 2014). Even if the facts and reasonable inferences permit a conclusion different from that reached by the trial court, we will not substitute our judgment for that of the trial court unless its decision is clearly against the logic and effect of the facts and circumstances before it. *Priore*, 65 N.E.3d 1065.

## 1. Alleged Bias by Trial Court

[18] Before turning to the merits of the trial court's findings and judgment, we must address Jack's claim, which permeates his appellate briefs, that the special judge was biased against him. *See, e.g.*, Appellant's Br. p. 27 (trial court displayed "an alarming amount of bias."). He has waived this claim because he does not cite any legal authority to support it. *See McCollough v. Noblesville Schs.*, 63 N.E.3d 334, 346 (Ind. Ct. App. 2016) (claim waived because it was not supported by "cogent argument" or "relevant authority"), *trans. denied*.

[19] Waiver notwithstanding, the law presumes a trial judge is unbiased. *Richardson v. Richardson*, 34 N.E.3d 696 (Ind. Ct. App. 2015). To overcome that

presumption, the party asserting bias must establish that the trial judge has a personal prejudice for or against a party. *Id.* Adverse rulings alone are insufficient to show bias or prejudice. *Dan Cristiani Excavating Co., Inc. v. Money*, 941 N.E.2d 1072 (Ind. Ct. App. 2011), *trans. dismissed*.

[20] Jack does not demonstrate actual personal bias by the special judge. He strongly disagrees with the trial court's credibility determinations, but the court's determinations have ample evidentiary support. Jack testified he was the operations manager and oversaw managing personnel, payroll, licenses, code compliance, "everything." Tr. Vol. II, p. 134. After Angela finished cross-examining Jack at length about NCR and Jack's financial arrangements, the court asked him about NCR's rental expenses and stated:

> I'm just saying, I'm looking at these numbers and the numbers are not making sense. And these are official tax returns, uh, I-I-I'm just – I'm just telling you flat out what my opinion is as far as what's going on here because things are just not adding up, uh, every time we turn the corner somethings [sic] eith-either misstated or it's hidden.

Tr. Vol. III, p. 10.

[21] The court later stated, about Jack's testimony:

> [Jack and his partner] have everything to do with what goes into the business or what they're paying. You know for-for somebody that's in con-control of all the expenses, to sit up here and say 'I don't know', 'I don't know', 'I don't know', 'I don't know', is not reasonable. I'm-I'm just telling you because I have to examine how reliable a witness is. I have to judge their credibility, and it's-it's not adding up. Now you-you can go ahead, uh, you-are you finished?

*Id.* at 16.

In its findings of fact and judgment, the court discussed its assessment of Jack's credibility at length, as follows:

> Jack's responses during the course of the trial, both in questions from counsel as well as the Court, exhibited a reluctance, obfuscation or refusal to answer. Jack's position as the person in charge of office operations for the last 14 years would suggest that Jack would have much greater familiarity with the business, its operations, and its management than what his testimony demonstrated. Jack was ignorant of many basic aspects of the business and its books, or he was intentionally withholding information from the Court and from Angela. It is expected by the Court that a party will come to the Court prepared to provide accurate information and truthful testimony regarding the issues before the Court. Jack was certainly aware that the assets and liabilities of the parties, the circumstances surrounding the business, its operation and its value would be issues before this Court. On a number of occasions, Jack was asked straightforward questions regarding [:]
>
> a.  certain NCR expenses,
>
> b.  entries on tax returns,
>
> c.  financial adjustments made in the business or tax records,
>
> d.  substantially higher depreciation expense reported on income taxes,
>
> e.  reporting of losses relating to Island Respiratory business that he closed after this dissolution of marriage was filed,
>
> f.  the establishment of bank accounts for the children,
>
> g.  his inability or refusal to identify, or even estimate, the increase or decrease in the amounts of any of the investment accounts owned by the parties, when he acknowledged that he had recently received account statements showing balances of the accounts,

> h.  the transfer of a Harley Davidson motorcycle to his son,
>
> i.  his reluctance or refusal to pay certain medical bills incurred relating to Angela's illness and recovery,
>
> j.  his reluctance or refusal to pay for the repair of items at the marital residence,
>
> k.  his refusal to return items he removed from the marital residence during the pendency of this dissolution action, and
>
> l.  his refusal to provide financially for Angela throughout the course of this action.
>
> In general Jack exhibited a lack of credibility in his testimony. On a number of occasions it appeared to the Court that he was attempting to hide or avoid answering legitimate questions regarding relevant issues.

Appellee's App. Vol. 2, pp. 32-34.

[23]  The special judge's comments at trial and in the findings in the final judgment do not exhibit bias. Rather, the judge fulfilled his duty to consider the witnesses' demeanor and make credibility determinations accordingly. Jack points out that the trial court ruled against him on many issues in the case, but adverse rulings, standing alone, do not establish bias. Jack has failed to demonstrate personal prejudice on the part of the trial court.

## 2. Valuation of Jack's Share of NCR

[24]  Jack claims the trial court erred in valuing his share of NCR at $848,872, asserting the court's conclusion lacks evidentiary support. The parties each submitted evidence from expert witnesses. Jack's expert witness, Brad Minor of Blue & Company, determined Jack's fifty percent share of the business had a fair market value of $440,000, excluding personal goodwill. Angela's expert

witness, Tina M. Gulich of RSM US, LLP, assessed the fair market value of Jack's share at $760,000.

[25] The trial court's findings and the evidence underpinning the findings are more than adequate to support the $848,872 valuation. The court adopted one of the valuation methods identified by Minor to calculate a preliminary value for the entire business ($2,185,000), but the court also identified shortcomings in Minor's calculations that caused the court to choose not to accept them in their entirety. For example, Minor used information provided by NCR to calculate Jack's income from salary and dividends, but Jack's tax returns for 2013 and 2014 show that he received $200,000 in dividends that was not included in Minor's report. In addition, Minor considered NCR's building to be a corporate asset for purposes of his report, but he later learned Jack and Shaw owned it. The court thus applied discounts to the preliminary value per the recommendations in Gulich's report, not Minor's report, to arrive at the final value of Jack's one-half share of the business. The special judge concluded the final value represented, among other factors, "the actual income generated by the business and distributed to its principals." Appellee's App. Vol. 2, p. 39.

[26] Jack argues Gulich's testimony is less "credible" than his expert's testimony because Gulich did not perform an independent investigation. Reply Br. p. 5. She instead reviewed Minor's report and Jack's tax returns to generate a "rebuttal report." Appellant's App. Vol. 2, p. 37. This argument amounts to a request to reweigh the evidence. Jack does not argue, let alone demonstrate, that Gulich's conclusions were inaccurate because they relied on Jack's expert's

report. Further, as the trial court noted, Angela had far less resources than Jack during the dissolution process, to the point that Jack was required to pay for Angela's expert witness.

[27] Jack further argues that during his own testimony, he valued his share at half of $534,000 and argues that the trial court should have accepted that value. As is noted above, the court concluded, "In general Jack exhibited a lack of credibility in his testimony." Appellee's App. Vol. 2, p. 34. We may not second-guess the trial court's credibility assessment.

[28] Finally, Jack argues the trial court incorrectly considered the role of personal goodwill in valuing Jack's share of the business. Personal goodwill is a factor in valuing a business and is attributable to an individual owner's personal skill, training, or reputation. *Yoon v. Yoon*, 711 N.E.2d 1265 (Ind. 1999). Personal goodwill is not a marital asset. *Id.*

[29] Minor applied a thirty-three percent discount to the value of Jack's share of the business due to personal goodwill. He explained that Jack and his partner are "experts in the industry," and although they have different roles in the business "both are critical to the business." Tr. Vol. III, Respondent's Ex. D, p. 29. In response, Gulich stated there should be no discount for personal goodwill because (1) Minor's report did not provide any evidentiary support for the discount; and (2) there is no evidence that Jack had any specialized credentials or that he was personally bringing business to NCR based on his reputation. In the final judgment, the court noted Jack managed the office and the employees,

but he had no role in sales or customer relations. The court ultimately discounted the value of Jack's share in NCR by two percent for personal goodwill, citing Gulich's report and further determining that the nature of Jack's job and the lack of marketing in his own name limited the amount of personal goodwill. The court's finding is amply supported by the evidence. In summary, we cannot say the trial court abused its discretion in valuing Jack's share of NCR or that the court's findings on the issue lack factual support.

### 3. Valuation of Jack's Share of NCR's Office Building

[30] Jack claims the trial court erred by overvaluing his share of the ownership of NCR's office building, arguing that undisputed evidence shows he owned only a half-interest in the property. Angela responds that Jack invited any error by misleading the court during the hearing about the ownership of the building.

[31] The trial court issued the following findings as to the value of Jack's share of ownership in the building:

> 595 Manchester Avenue (Exhibit 6, Line 1) is titled in the names and owned by Jack and Aaron Shaw's [sic]. It is not titled in the name or owned by NCR. This property generates $24,000 in income for Jack and Aaron Shaw through the provisions of a triple net lease. NCR has paid Jack and Aaron the initial purchase price of this property several times over. This asset was a source of $12,000 in annual income for some time to the Delauter family. One-half of the property's value is a marital asset. One-half of the assessed value is only $31,000.

Appellee's App. Vol. 2, pp. 14-15. There is sufficient evidence to support the trial court's findings. Although Minor listed the building as an asset of NCR in

his report, Jack conceded at the hearing that he was a co-owner of the building. Angela did not dispute that Jack owned a half-share in the building, and the parties agreed the building was valued at $62,000.

[32] Although the findings are supported by the evidence, the trial court concluded the property had a value of $62,000 as a marital asset. *Id.* at 56. This conclusion contradicts the finding that Jack's one-half share was worth $31,000. Thus, the trial court's conclusion is outside the range of evidence and is unsupported by the findings. We must remand for clarification of the value of Jack's fifty percent interest in NCR's office building. *See Balicki v. Balicki*, 837 N.E.2d 532 (reversing trial court's conclusion as to value of share of ownership of construction company because it was unsupported by the evidence), *trans. denied*.

[33] Jack notes he testified NCR's office building is subject to a mortgage and argues the mortgage must be considered in assessing the value of his share of the building. Jack did not submit any documents in support of his testimony. To the contrary, his expert erroneously stated the building was an asset of NCR, and Jack did not include the mortgage in the list of marital assets and liabilities he presented at the hearing. In addition, the trial court found as a general proposition that Jack's testimony was not credible. The court was free to disregard Jack's unsupported assertion about the existence of a mortgage.

# 4. Division of the Parties' Tax Refunds

[34] Jack argues the trial court's calculation and division of the parties' tax refunds is unsupported by the evidence. Angela claims the value of the refunds and the court's allocation among the parties has ample evidentiary support.

[35] The trial court concluded the parties' tax refunds for 2013, 2013, and 2014 were worth $64,963 and awarded Angela $38,977.80, or sixty percent of the total. There is evidence to support the court's valuation. The parties agreed the total value of the tax returns was $64,963. Tr. Vol. III, Petitioner's Ex. 6, Respondent's Ex. A. It is undisputed that the parties met in Spring 2015 and agreed to file amended joint returns for 2012 and 2013. The parties further agreed to split the refunds equally. Angela recalled the total amount they agreed upon was $64,000 and submitted tax records substantiating that amount. Jack testified the total amount of refunds they discussed was no more than $25,000 after paying pending tax liabilities. The trial court was entitled to credit Angela's testimony over Jack's.

[36] Jack points out that the amended tax return for 2013 showed $10,035 was owed to the State of Indiana and claims that Angela's share of the refunds should have reflected a reduction due to the 2013 payment. Angela testified she did not remember that they owed money on taxes for that year and does not recall Jack asking her "to go halves on paying that back" as part of their transaction. Tr. Vol. II, p. 105. Jack controlled the parties' finances and financial records throughout their marriage, and he initiated the discussion about amending their tax returns.

[37] Jack also argues the trial court erred in awarding Angela sixty percent of the refunds' value when she had agreed to receive fifty percent. We address the overall division of the marital estate below. The trial court did not abuse its discretion in valuing the tax refunds, and the court's findings on the issue are supported by the evidence.

## 5. Identification and Division of Baird Account

[38] Jack argues the trial court erred by identifying Baird Account 001-4C as a marital asset because he claims there is no proof such an account exists. Angela disagrees, pointing to an exhibit that was admitted during the hearing. We agree with Angela.

[39] During the evidentiary hearing, the court admitted Exhibit 6 into evidence without objection by Jack. Exhibit 6, which was a list of marital assets and liabilities prepared by Angela, identified Baird Account 001-4C as Jack's IRA, with a value of $7,955.25 as of March 19, 2013. Further, during subsequent testimony about the parties' financial accounts, the trial court told the parties to focus only on accounts that were in dispute. Tr. Vol. II, p. 27. Neither Angela nor Jack testified about Baird Account 001-4C, so the court could have reasonably concluded its existence was not in dispute. The trial court's findings of fact as to the account are supported by the evidence, and the court's conclusion is supported by the findings.

## 6. Inclusion of Motorcycle in Marital Pot

[40] Jack asserts the trial court erred in including a Harley Davidson VRod motorcycle in the marital pot, claiming he transferred it to the parties' son before the date of separation. Although certificate of title is not itself proof of ownership or legal title to a vehicle, the certificate does raise a presumption of legal title in the holder, which is subject to challenge by other evidence. *Estudillo v. Estudillo*, 956 N.E.2d 1084 (Ind. Ct. App. 2011).

[41] It is undisputed that Jack bought the motorcycle in 2010, prior to the parties' separation, so it was a marital asset as of the date of purchase. Jack claimed he sold the motorcycle to their son in 2011, prior to separation, but Angela testified the transfer of the motorcycle did not take place until 2012 or 2013, after Jack bought another motorcycle, and she "didn't really have a choice" in the transfer. Tr. Vol. II, p. 81. Further, Jack conceded at trial he told his son to pay him $4000 and to pay Jack's daughter $4,000 for her share of the bike, but the son had apparently not made the payments as of the date of the evidentiary hearing because Jack still held title to the motorcycle. Based on these facts, the trial court did not err in concluding the motorcycle was still part of the marital estate.

## 7. Unequal Division of the Marital Estate

[42] Jack argues the trial court erred by dividing the marital estate sixty/forty in favor of Angela. Angela claims the court properly considered and applied the factors discussed in Indiana Code section 31-15-7-5.

[43] We conclude Jack has failed to rebut the strong presumption that the special judge considered and complied with the statute in ordering an unequal division of the marital estate. The court noted that although Jack has generated substantial and real income from NCR in recent years, Angela made crucial contributions to NCR's success by contributing funds she received from inheritances. The record further demonstrates Angela devoted extra time to raising the children and maintaining the house, to the detriment of her painting and wallpapering business, while Jack focused on building up NCR. Thus, the trial court did not err in concluding both parties contributed to the acquisition of marital property.

[44] With respect to whether property was acquired during the marriage by inheritance or gift, the court correctly noted NCR's value developed during the parties' lengthy marriage and Angela contributed several inheritances to NCR's early success.

[45] As for the economic circumstances of each party at the time of the disposition of the property, the trial court determined Jack was in a far better position than Angela, noting Jack had enjoyed several years of strong income from NCR while Angela's income from her small businesses was far less, and she had been hampered in recent years by a cancer diagnosis and the need for extensive treatment. The evidence supports the trial court's findings.

[46] Turning to the conduct of the parties as related to the disposition of marital property, the special judge stated Jack had exercised unilateral control over the

parties' finances and assets, and he had limited Angela's access to the information. The record supports this determination, because Angela testified Jack intercepted all financial documents at their mailbox and kept them at his office. After the parties separated, Jack continued to maintain control over financial information. The court also noted Jack was, in the court's opinion, evasive during his testimony about income he had received from NCR.

[47] Finally, turning to the earnings and earning potential of the parties, the court noted, "Angela does not possess the economic circumstances or economic ability to receive one-tenth of the economic benefit Jack receives annually from NCR." Appellee's App. Vol. 2, p. 54. The record demonstrates there is no reason to believe Angela will generate significantly higher earnings in the future, while Jack may continue to receive large amounts of revenue from NCR in the form of salary, dividends, and rent payments.

[48] Jack argues the trial court's decision on this issue was a "skewed result" based on misconstruing the testimony and evidence and was intended to be punitive against him. Appellant's Br. p. 26. We have already resolved Jack's claim of alleged bias on the part of the special judge.

[49] Jack further claims many of the court's findings of fact relevant to the division of the estate are unsupported by the evidence. Appellant's Br. pp. 21-26. Many of these challenges to the findings are without merit or have already been addressed above. Jack argues the trial court erred in concluding Jack lived much better than Angela during the separation. Viewing the evidence in the

light most favorable to the judgment, in 2013 and 2014 Jack received a salary, generous dividends, and rental income from NCR. Further, in 2013 Jack had effectively repaid a $100,000 loan from NCR through accounting practices that did not affect his dividends. By contrast, Angela was still undergoing cancer treatments in 2013, and her income was greatly limited by her medical challenges. Jack continued to exercise unilateral control over the parties' finances and financial records, and there were several occasions where Angela experienced medical or other emergencies and was short on funds. The trial court's finding is supported by sufficient evidence.

[50] Jack also argues the trial court misconstrued the evidence in finding Jack was required to pay part of Angela's expert witness fees, claiming he willingly agreed to pay those fees. The record demonstrates Angela filed a motion for expert witness fees and the special judge held a hearing at which the parties reached an agreement, so it can hardly be said that Jack's contributions were voluntary.

[51] Finally, Jack argues the trial court erroneously awarded Angela sixty-five percent of the parties' financial accounts in violation of the general sixty-forty split. The trial court stated in its findings that it would award sixty-five percent of the accounts to Angela, but in its conclusions on the findings the trial court awarded only sixty percent. Appellee's App. Vol. II, p. 56. The references to sixty-five percent appear to be scrivener's errors and are harmless error at best. In summary, Jack has not demonstrated the trial court abused its discretion in ordering a sixty-forty split of the estate. *See Nowels v. Nowels*, 836 N.E.2d 481

(Ind. Ct. App. 2005) (no error in unequal division of marital estate in favor of wife; husband had far more earnings potential than wife, who could not work due to medical disability).

[52] For the reasons stated above, we affirm the judgment of the trial court in part and reverse in part. We remand to the trial court for clarification of the value of Jack's one-half ownership share of NCR's office building.

[53] Judgment affirmed in part, reversed in part, and remanded.

Barnes, J., and Crone, J., concur.