# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**L. SCOTT PEJIC**
DiMartino & Pejic, LLP
Michigan City, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JUSTIN F. ROEBEL**
Deputy Attorney General
Indianapolis, Indiana

**FILED**

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| A.J.R., | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 46A03-1306-JV-243 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE LAPORTE CIRCUIT COURT
The Honorable Thomas J. Alevizos, Judge
Cause No. 46C01-1211-JD-699

**January 23, 2014**

**OPINION - FOR PUBLICATION**

**ROBB, Judge**

## Case Summary and Issues

A.J.R. appeals the juvenile court's adjudication of A.J.R. as a delinquent based on conduct that would be criminal mischief, cruelty to animals, and aiding, inducing, or causing criminal mischief if committed by an adult. He raises three issues on appeal: (1) whether admission of certain testimony given by a police officer without notice from the State that the officer would testify as a skilled witness was an abuse of discretion; (2) whether there was sufficient evidence to prove A.J.R. shot two cattle; (3) assuming he shot the cattle, whether there was sufficient evidence to prove his acts constituted mutilation or torture of an animal. We hold that the juvenile court did not abuse its discretion by admitting the officer's testimony, and the evidence is sufficient to prove A.J.R. shot two cattle and to sustain his adjudications for criminal mischief. However, concluding A.J.R.'s actions did not constitute mutilation or torture of an animal, we reverse his adjudications for cruelty to an animal. Accordingly, we affirm in part and reverse in part.

## Facts and Procedural History

On the evening of November 28, 2012, seventeen-year-old A.J.R. and fourteen-year-old C.C. were cruising the county roads of LaPorte County while coyote hunting. The two teenagers had gone hunting together approximately thirty times before. On this particular occasion, the boys were hunting with a semi-automatic AR-15-style rifle, which was a gift from C.C.'s father. During the outing, they observed several coyotes but had no success in killing one. The boys left their hunting location driving A.J.R.'s black Jeep and turned onto County Road 500 South. They came upon a pasture of cattle, at which point A.J.R. said

2

"let's shoot those cows." Transcript Vol. I at 101. A.J.R. turned the vehicle around, positioning the driver's side of the vehicle nearest to the pasture. He picked up C.C.'s rifle, leaned out the driver's side window, and fired two shots into a herd of cattle.

A.J.R. then turned left onto County Road 425 West and approached another cattle pasture on the passenger's side of the vehicle. A.J.R. stopped the vehicle and told C.C. to shoot the cattle. C.C. took the rifle and fired one shot out of the passenger window at a cow approximately ten yards away, striking it in the head.

The cattle in both pastures were owned by Glen Minich, who lives nearby. Minich was home that evening and heard what sounded like gunshots coming from close-by. Minich walked out to his porch and saw a dark-colored vehicle driving slowly down the road. He observed the vehicle stop next to one of his cattle lots and heard one gunshot ring out from that direction. After the shot, the vehicle drove away.

Minich and his wife first drove to the cattle lot on County Road 500 South and found that two of their cattle had been shot. Both cows were lying on the ground: the first had a wound on its head and the other had no visible wound but was moaning and unresponsive. Both cattle were deceased within thirty minutes of the incident.

While driving to the location of the second shooting, Minich saw a dark-colored Jeep driving down the road and followed it. The Jeep eventually pulled over, and Minich identified A.J.R. as the driver. Minich had a brief conversation with A.J.R. during which A.J.R. denied shooting the cattle. Minich obtained the Jeep's license plate number and called the police.

3

The same evening, both A.J.R. and C.C. made statements to the police. C.C. was interviewed first. He initially denied any knowledge of the incident but later admitted to shooting one of the cattle and also implicated A.J.R. A.J.R. was interviewed later and initially denied any knowledge of the incident; however, after he was informed C.C. made a statement, A.J.R. admitted to driving the vehicle when the cattle were shot.

On December 9, 2012, the State alleged A.J.R. was a delinquent juvenile based on acts that, if committed by an adult, would constitute one count of aiding, inducing, or causing criminal recklessness, a Class D felony; two counts of criminal recklessness, Class D felonies; three counts of cruelty to an animal, Class D felonies; two counts of criminal mischief, Class A misdemeanors; and one count of aiding, inducing, or causing criminal mischief, a Class A misdemeanor. A two-day fact-finding hearing was held on May 10 and May 17, 2012. On May 20, 2012, the juvenile court issued an order finding the State had met its burden of proving A.J.R. committed two counts of cruelty to an animal, two counts of criminal mischief, and aiding, inducing, or causing criminal mischief. Accordingly, A.J.R. was adjudicated a delinquent on those counts. The court ordered A.J.R. to serve a thirty-day suspended jail sentence and probation and to complete fifty hours of community service. A.J.R. filed a motion to correct error, which was denied. This appeal followed. Additional facts will be supplied as necessary.

## Discussion and Decision

### I.  Skilled Witness Testimony

A.J.R. challenges the juvenile court's admission of opinion testimony offered by LaPorte County Sheriff's Deputy Troy Ryan at the fact-finding hearing.  The admission of evidence is within the sound discretion of the trial court, and the trial court's ruling is reviewed only for an abuse of discretion.  Hale v State, 976 N.E.2d 119, 123 (Ind. Ct. App. 2012).  An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances.  Id.

Indiana Evidence Rule 701 provides that lay witnesses may provide testimony in the form of opinions or inferences, so long as the testimony is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue."  This rule encompasses persons whom the courts have labeled "skilled witnesses."  Kubsch v. State, 784 N.E.2d 905, 922 (Ind. 2003).  A skilled witness is a person who possesses specialized knowledge short of that necessary to be declared an expert under Indiana Evidence Rule 702 but beyond that possessed by an ordinary juror.  Id.  "Skilled witnesses not only can testify about their observations, they can also testify to opinions or inferences that are based solely on facts within their own personal knowledge."  Hawkins v. State, 884 N.E.2d 939, 944 (Ind. Ct. App. 2008) (citation omitted), trans. denied.  It is within the trial court's discretion to determine whether a witness is qualified to give an opinion.  Id

Officer Ryan was on duty the night of the incident and investigated the area where the two shootings occurred. Officer Ryan testified that he was a member of the Emergency Response Team, and as part of that duty, he handled and was familiar with military-style equipment such as the M-16 rifle. He testified that he was familiar with the AR-15 style of rifle used in the shootings, because it and the M-16 are "pretty much the same platform." Tr. Vol. I at 58. At the scene of the first shooting, he observed two .233 caliber shell casings—the same caliber used in C.C.'s rifle—located in the road near the pasture. Officer Ryan testified that based on the location of the shell casings and the way assault rifles eject shell casings, it was his opinion that the shots were more likely fired from the driver's side than the passenger's side of a westbound-facing vehicle. A.J.R. essentially makes two arguments against the admission of Officer Ryan's opinion testimony. First, he asserts that the admission of such testimony without prior notice from the State deprived A.J.R. of his constitutional right to a fair fact-finding hearing. Second, he contends there was insufficient foundation to allow Officer Ryan's skilled witness testimony.

First, A.J.R. asserts that it was fundamentally unfair to permit Officer Ryan to offer skilled witness testimony without the State providing advance notice to him. He alludes to his general right to receive a fair fact-finding hearing. U.S. CONST. amend. XIV, § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."); see also In re Gault, 387 U.S. 1, 30-31 (1966) (holding the Due Process Clause applies to juvenile delinquency proceedings). However, A.J.R. offers no additional authority that would lead us to believe explicit notice of skilled witness testimony is constitutionally

required to facilitate a fair trial. He provides no citation to a statute, evidentiary rule, trial rule, or court decision supporting his argument, and we are aware of none. We note, as the juvenile court did, that Officer Ryan was identified as an investigating officer on the scene, and A.J.R. did have notice that Officer Ryan was a potential State's witness.[1] A.J.R.'s attorney was able to conduct effective cross-examination of Officer Ryan, and A.J.R.'s claim that a lack of more specific notice hindered his ability to present an adequate defense is weakened by the fact that he did not request a continuance. Admission of Officer Ryan's opinion testimony did not deprive A.J.R. of his right to due process and a fair fact-finding hearing.

Alternatively, A.J.R. argues Officer Ryan's opinion testimony was inadmissible due to lack of foundation. Specifically, A.J.R. asserts Officer Ryan's testimony was not "rationally based on [his] perception," Ind. Evidence Rule 701, because he did not actually witness the position of the vehicle or the rifle when the shots were fired. We disagree with the contention that a proper foundation was not laid. Officer Ryan testified that he has handled and is familiar with rifles substantially similar to the one used in the shooting. He is familiar with the ammunition the AR-15 fires and the manner in which shell casings are ejected from the rifle. Further, Officer Ryan personally observed the location of the shell casings on the

---

[1] Claiming notice of Officer Ryan as a potential witness is not enough, A.J.R. makes a novel argument: failure to specifically provide notice of impending opinion testimony would require defendants to conduct discovery in violation of their right to remain silent and the right to have the State prove its case beyond a reasonable doubt. A.J.R. cites no authority for his proposition, nor does he make any discernible connection between a discovery request and the Fifth Amendment's protection against compelled testimonial evidence. Moreover, a defendant's discovery request in no way changes or shifts the State's burden to prove guilt beyond a reasonable doubt.

7

road at the scene. Based on Officer Ryan's knowledge of how assault rifles eject shell casings and the casings' positioning on the road, he could give an opinion regarding whether the casings more likely came from the driver's side or the passenger's side of a westbound vehicle. The juvenile court did not abuse its discretion by concluding the State laid a proper foundation for the testimony.

## II.  Sufficiency of Evidence

A.J.R. presents several arguments on appeal challenging the sufficiency of the evidence supporting his adjudication. When reviewing a claim of insufficient evidence in a juvenile case, we apply the same standard of review as if it were an appeal of a criminal conviction. See K.W. v. State, 984 N.E.2d 610, 612 (Ind. 2013). We neither reweigh the evidence nor assess the credibility of witnesses. Id. We consider only the probative evidence and reasonable inferences supporting the judgment. Id. And the adjudication will be affirmed if the probative evidence and reasonable inferences drawn therefrom could have led a reasonable fact finder to find the juvenile guilty beyond a reasonable doubt. Id. The adjudication shall be reversed "if there is no evidence or reasonable inference to support any one of the necessary elements of the offense." Id.

### A. Evidence A.J.R. Shot Two Cattle

First, A.J.R. contends that there was insufficient evidence to establish that he shot and killed two of the cattle owned by Minich. His argument primarily focuses on Officer Ryan's testimony and an assertion that the exact position of the vehicle at the time of the first

8

shooting is unknown. However, in making this argument, A.J.R. turns a blind eye to C.C.'s testimony identifying him as the person who shot at the first herd of cattle.

"It is well established that the testimony of a single eye witness is sufficient to sustain a conviction." Brasher v. State, 746 N.E.2d 71, 72 (Ind. 2001). C.C., an eye witness, testified against A.J.R. at the fact-finding hearing. Essentially, his testimony was that he saw A.J.R. pick up the rifle, lean out the window, and fire two shots at the herd of cattle in the pasture off of County Road 500 South. C.C.'s testimony, combined with the evidence that two cattle were found injured in the same pasture immediately after the shooting, is sufficient to prove A.J.R. shot two of the cattle. Therefore, A.J.R.'s adjudications for criminal mischief, which are founded on his killing of the two cattle, must be affirmed.

### B. Indiana Code section 35-46-3-12(c): Cruelty to Animals

A.J.R. also maintains that, even assuming he shot the first two cattle, his adjudications for animal cruelty cannot stand. On this point, we agree. Based on the language of the relevant statutes, the evidence most favorable to the juvenile court's decision is insufficient to constitute cruelty to an animal.

"A person who knowingly or intentionally tortures or mutilates a vertebrate animal commits torturing or mutilating a vertebrate animal, a Class D felony." Ind. Code § 35-46-3-12(c). Indiana law defines both "mutilate" and "torture."

> (3) "Mutilate" means to wound, injure, maim, or disfigure an animal by irreparably damaging the animal's body parts or to render any part of the animal's body useless. The term includes bodily injury involving:
>    (A) serious permanent disfigurement;
>    (B) serious temporary disfigurement;

9

(C) permanent or protracted loss or impairment of the function of a bodily part or organ; or
(D) a fracture.

***

(5) "Torture" means:
(A) to inflict extreme physical pain or injury on an animal with the intent of increasing or prolonging the animal's pain; or
(B) to administer poison to a domestic animal (as defined in section 12(d) of this chapter) or expose a domestic animal to a poisonous substance with the intent that the domestic animal ingest the substance and suffer harm, pain, or physical injury.

Ind. Code § 35-46-3-0.5.

The evidence most favorable to the adjudication is that A.J.R. leaned out of his window, fired two shots at a herd of cattle approximately fifteen yards away, and immediately drove away. One cow had a bullet wound on its head, and the other cow had no visible injury but was moaning and unresponsive. Both cattle died within thirty minutes of the shooting.

1.    Mutilation

As to mutilation, the State contends that the gunshot injuries worked to "wound, injure, maim, or disfigure" two cattle. This is the extent of the State's mutilation analysis. The State's position treats <u>any</u> wound or injury—even an unidentifiable one—as "mutilation" under the statute. We do not believe the legislature intended such an outcome, because it would render a large portion of the mutilation definition utterly meaningless. See <u>Adams v. State</u>, 960 N.E.2d 793, 798 (Ind. 2012) ("Our primary goal in interpreting statutes is to determine and give effect to the Legislature's intent.").

10

Notably, the State ignores operative, qualifying language in the statute—namely, language providing that mutilation occurs only when the wound or injury is achieved "by irreparably damaging the animal's body parts or to render any part of the animal's body useless." Ind. Code § 35-46-3-0.5(3) (emphasis added); see Adams, 960 N.E.2d at 798 (statutes must be read "as a whole, avoiding excessive reliance on a strict, literal meaning or the selective reading of individual words."). The statute then lists examples of sufficient injuries, including serious disfigurement, impairment of a body part or organ, and a fracture. Ind. Code § 35-46-3-0.5(3)(A)-(D). Based on a plain reading of the statute, we hold that a wound or injury must be of the variety contemplated by the statute before it qualifies as mutilation.[2]

Moreover, the statute cannot be fairly interpreted so as to include any injury that results in the death of an animal. At first blush, one might think there is enough ambiguity in the statute to allow the phrase "permanent or protracted loss or impairment of the function of a bodily part or organ" to also encompass the death of an animal. Ind. Code § 35-46-3-0.5(3)(C). However, we do not believe this to be the appropriate statutory analysis. The Rule of Lenity dictates that statutes that are criminal or penal in nature must be strictly construed, and ambiguity must be resolved in favor of the defendant. Dye v. State, 984 N.E.2d 625, 630 (Ind. 2013). Further, "when construing a statute, all sections of an act are

---

[2] Although decided prior to the enactment of statutory definitions for "mutilate" and "torture," this court held that "the act of shooting [an animal] is not enough alone to establish cruelty to an animal by either torture or mutilation." Boushehry v. State, 648 N.E.2d 1174, 1178 (Ind. Ct. App. 1995). We believe that proposition holds true under the current version of the statute.

11

viewed together. Additionally, we will avoid an interpretation that renders any part of the statute meaningless or superfluous." Zanders v. State, 800 N.E.2d 942, 944-45 (Ind. Ct. App. 2003) (citation omitted). An interpretation of the cruelty to animals provision that would automatically qualify any injury resulting in the death of an animal as "mutilation" would forsake other provisions of the Indiana Code to a position of meaninglessness. This is because other portions of our statutory scheme already deal with the killing of animals. Subsection (d) of the very statute under which A.J.R. was charged provides it is a Class D felony if a person "knowingly or intentionally kills a domestic animal without the consent of the owner . . . ." Ind. Code § 35-46-3-12(d).[3] And statutory penalties are also provided for those who harass, hunt, capture, or kill a wild animal in violation of the article regulating fish and wildlife in Indiana. See generally Ind. Code §§ 14-22-1-1 through 14-22-41-12; see also Ind. Code § 14-22-34-5; Ind. Code § 14-22-38-1 to -5 (specifically dealing with violations).

To clarify, our interpretation does not necessarily foreclose the possibility that a fatal injury may qualify as mutilation. For example, a person who knowingly or intentionally severs the limb of a wild animal which subsequently bleeds to death as a result of the injury would have mutilated that animal. We echo, however, our overarching principle: the type of injury is a key component of and necessary condition to making a determination of mutilation.

---

[3] Domestic animals include "cattle, calves, horses, mules, swine, sheep, goats, dogs, cats, poultry, ostriches, rhea, and emus . . . [and] animal[s] of the bovine, equine, ovine, caprine, porcine, canine, feline, camelid, cervidae, or bison species." Ind. Code § 35-46-3-12(d).

12

Here, there is no evidence that A.J.R. targeted either cow in a way that would result in serious disfigurement, protracted impairment of a body part or organ, or a fracture. He did not purposely shoot its legs, gouge out its eyes, sever a limb or tail, or perform any other act resulting in damage to the animal that could reasonably fall within the definition of mutilation. Rather, the injury to one cow was a small bullet wound to the head, while the injury sustained by the second cow was not even identifiable. The evidence in this case cannot reasonably fit within the statutory definition of mutilation, and the State offers no real argument that it does.

## 2. Torture

The evidence in this case also falls short of establishing that A.J.R. knowingly or intentionally tortured either of the cattle. Contrasting our determination regarding mutilation, which relies on statutory interpretation and the conclusion that the injuries in this case do not fall within the scope of the statute, our conclusion that torture was not established is based upon a failure to prove A.J.R. acted with the requisite mens rea.

The State argues that "[b]y shooting cows and then abandoning them without regard to whether they lived or died, the court as factfinder could reasonably determine that [A.J.R.] would have been aware of the high probability that he was inflicting injury and pain." Brief of Appellee at 14. We do not quarrel with the proposition that a reasonable person could infer that either animal was injured or experiencing pain after it was shot. See Tooley v. State, 911 N.E.2d 721, 724-25 (Ind. Ct. App. 2009) (holding a fact finder could reasonably infer a cat suffered pain after being drop-kicked by a man wearing a steel-toed boot, despite

13

that the cat could not testify as to its pain and the cat was never examined), <u>trans. denied</u>.

However, once again, the State disregards key language in the controlling statute. Torture means to "inflict extreme physical pain or injury on an animal <u>with the intent of increasing or prolonging the animal's pain</u>." Ind. Code § 35-46-3-0.5(5) (emphasis added). A person acts intentionally "if, when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2(a). The evidence in this case does not support an inference that A.J.R.'s objective in shooting the cattle was to increase or prolong their pain, and it certainly was not proven beyond a reasonable doubt.

The State's brief goes on to specifically discuss A.J.R's mental state:

> [T]he court could reasonably infer both that [A.J.R.] would have known (1) that shooting a cow with an assault rifle would injure the cow and (2) that there is a <u>possibility</u> that the cow would not die instantly. . . . [T]he commonsense reality [is] that a seventeen-year-old would know that a [high-powered rifle] is capable of both injuring an animal and killing an animal . . . .

Br. of Appellee at 16 (emphasis added). This argument's shortfalls are apparent. Knowledge of the mere possibility that an animal will not die instantly does not amount to a conscious objective of increasing or prolonging extreme physical pain.

Moreover, the State's theory is that A.J.R. shot the cattle and drove away without knowing (or caring) whether they lived or died. If anything, those facts stand in direct contradiction to the idea that A.J.R.'s objective was to prolong the animals' pain. To put it simply, he could not harbor such an objective without also knowing the cattle were alive and suffering.

14

Because the definition of torture requires the sort of specific intent highlighted above, facts indicating A.J.R. recklessly or randomly fired into the herd of cattle would not support a finding of torture here. This leaves only one possibility that could support the juvenile court's finding: A.J.R. knew where the cattle were injured at the time he shot and drove away and that their injuries would result in increased or prolonged suffering. "Knowledge and intent are both mental states and, absent an admission by the defendant, the trier of fact must resort to the reasonable inferences from both the direct and circumstantial evidence to determine whether the defendant has the requisite knowledge or intent to commit the offense in question." Stokes v. State, 922 N.E.2d 758, 764 (Ind. Ct. App. 2010), trans. denied. In this case, there is neither an admission by A.J.R. nor direct evidence from C.C. suggesting A.J.R. intended to torture the cattle, so the juvenile court could only rely on circumstantial evidence. As to one cow, an inspection by the owner and police revealed no visible wound; thus, we do not believe a reasonable inference can be drawn that A.J.R. knew the location of the wound or its effect when firing from a distance of fifteen yards away.[4] The second cow sustained a wound to the head. Assuming A.J.R. knew he shot the second cow in the head, one could not reasonably infer his objective was to torture the animal. Just the opposite would be true, as the reasonable inference would be that A.J.R. intended to kill the animal instantly.

In sum, the evidence presented in this case is not sufficient to allow a reasonable fact

---

[4] We recall C.C.'s testimony, in which he admitted to shooting one cow from approximately the same distance as A.J.R. but was unable to see where he hit the cow.

15

finder to conclude beyond a reasonable doubt that A.J.R. shot either of the cattle "with the intent of increasing or prolonging the animal's pain." Nor is the evidence sufficient to place the injuries in this case within the statutory definition of mutilation. Therefore, his adjudications for cruelty to an animal cannot stand.

## Conclusion

We conclude the juvenile court's admission of Officer Ryan's skilled witness testimony did not violate A.J.R.'s right to a fair fact-finding hearing. As to the evidence presented against A.J.R., we conclude there was sufficient evidence to prove he shot and killed two cattle; however, the evidence in this case was not sufficient to prove he mutilated or tortured either of the cattle. Hence, his adjudications for criminal mischief and aiding, inducing, or causing criminal mischief are affirmed, but his adjudications for cruelty to an animal are reversed.

Affirmed in part and reversed in part.

BARNES, J., concurs.

BROWN, J., concurs in result.