## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 28 2019, 9:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Courtney L. Staton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Michael J. Johnson,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | August 28, 2019<br><br>Court of Appeals Case No.<br>19A-CR-167<br><br>Appeal from the Noble Superior Court<br><br>The Honorable Robert E. Kirsch, Judge<br><br>Trial Court Cause No.<br>57D01-1803-MR-1 |

**Bailey, Judge.**

# Case Summary

Michael J. Johnson ("Johnson") was convicted of two counts of Murder, a felony,[1] and one count of Attempted Murder, a Level 1 felony.[2]  He was also found to be a habitual offender.[3]  The court imposed an aggregate sentence of 170 years and ordered Johnson to pay restitution.  Johnson now appeals.  We affirm Johnson's convictions and the length of his sentence.  However, because we conclude insufficient evidence supports the amount of restitution, we reverse the restitution order and remand for further proceedings on that limited issue.

# Issues

Johnson presents the following restated issues:

I.  Whether the trial court abused its discretion when it ruled on particular evidentiary matters, denying a motion to strike testimony and overruling certain objections.

II.  Whether sufficient evidence negates the existence of sudden heat.

III.  Whether sufficient evidence supports the determination that Johnson is a habitual offender.

---

[1] Ind. Code § 35-42-1-1.

[2] I.C. § 35-42-1-1; 35-41-5-1.

[3] I.C. § 35-50-2-8.

III.    Whether the aggregate sentence imposed is inappropriate.

IV.    Whether sufficient evidence supports the amount Johnson was ordered to pay in restitution.

# Facts and Procedural History

On March 5, 2018, Tiffani Cox ("Cox") borrowed Johnson's vehicle—a black Chevy Impala—and drove from Fort Wayne to Ligonier, where she met with Amberly Brown ("Brown") and Justin Adams ("Adams"). The trio ran errands together, after which they traveled to a Ligonier apartment rented to Amanda Feldstein ("Feldstein"). Brown and Adams went into the apartment. Cox drove back to Fort Wayne and returned the Impala to Johnson, who noticed a purse was missing from the trunk. The purse had been a gift to Johnson's fiancée, Kyra Frost ("Frost"). Johnson became angry and threatened to "bust loose" in the parking lot if Cox walked away. Tr. Vol. III at 120. Cox took this to mean Johnson would get out the gun he usually carried. Johnson demanded that Cox get in the Impala with him. Johnson and Cox drove to a gas station, and Cox went inside. Frost drove to the gas station in a separate vehicle, then went inside after Cox. Frost threatened to tell the police Cox stole the purse unless Cox took them to the Ligonier apartment to retrieve the purse. Johnson,

Frost, and Cox then began driving to the apartment—thirty or so miles away—with Cox and Frost in one vehicle and Johnson following in his Impala.[4]

[4] Cox approached the apartment door, flanked by Johnson and Frost. After Cox knocked, either Brown or Feldstein opened the door. Johnson and Frost then rushed past Cox and entered the apartment. Johnson took three steps, pulled out his gun, and held it "up in the air." *Id.* at 133. He demanded the purse. Around this time, Adams came out from an adjacent room. Upon seeing the gun, Adams ran out the back door into a patio area enclosed by a railing. Frost followed and tackled him. Adams—who at one point pleaded for his life—managed to escape and leap over the railing. Adams was about seventeen feet from the apartment when Johnson shot Adams in the back. The bullet passed through Adams's aorta, grazed his lung, then exited his chest. The wound was fatal. After killing Adams, Johnson aimed his gun at Brown. At this point, Feldstein entered the room and ducked by the laundry closet, covering her ears. Johnson aimed the gun at Feldstein and fired a bullet into the back of her head. Johnson then shot at Brown. At that point, Johnson yelled "let's get the hell out of here." *Id.* at 34. Johnson, Frost, and Cox fled out the back door. They jumped over the railing and took off in the two vehicles. Brown—who had not been struck by the bullet—checked on Feldstein and called 9-1-1. Feldstein was still breathing when Brown called 9-1-1, but eventually died from the wound.

---

[4] We take judicial notice of the approximate distance from Fort Wayne to Ligonier. *See* Ind. Evidence Rule 201; *see also Moore v. State*, 153 N.E. 402, 403 (Ind. 1926).

[5] Brown described the Impala to law enforcement and provided a cellphone number Cox had used that day. Law enforcement contacted the cellphone carrier and obtained the location of the phone, which was north of U.S. 20 and just west of LaGrange County. Hearing dispatches about the shooting and the cellphone ping, Officer Nicolas J. Dubea ("Officer Dubea") of the LaGrange Police Department positioned his patrol vehicle so it faced U.S. 20. Shortly thereafter, Officer Dubea saw a black Impala with one male occupant pass by. The driver—Johnson—tried to obscure his face. This movement raised the suspicions of Officer Dubea, who was not sure he had located the right Impala.

[6] Officer Dubea began following Johnson, who drove left of the center line on two occasions. Officer Dubea activated his emergency lights to conduct a traffic stop. Johnson initially braked but then drove off, reaching speeds in excess of 110 m.p.h. Officer Dubea pursued Johnson across LaGrange County and into Steuben County. After about twenty minutes, Johnson drove the Impala across "stop sticks" law enforcement placed on the road. The devices damaged the Impala. After the vehicle rolled into a yard, Johnson got out and started running. Officer Dubea then deployed his K-9 partner, Jax. Johnson looked back and yelled not to let the dog bite him, at which point Johnson lost his balance and fell. Officer Dubea called off Jax and then arrested Johnson.

[7] Johnson waived his rights and spoke with law enforcement on March 7, 2019. During that interview, Johnson admitted he was the shooter and claimed he was high on methamphetamine at the time. Johnson said he acted in the heat of the moment and indicated he was startled when Adams came into the room.

[8] The State brought the following charges against Johnson: Count I—Murder While Committing Robbery, a felony;[5] Count II—Murder While Committing Robbery, a felony; Count III—Attempted Murder, a Level 1 felony; Count IV—Murder, a felony; and Count V—Murder, a felony. The State also sought a sentencing enhancement, alleging Johnson was a habitual offender.

[9] A jury trial commenced in December 2018, at which Johnson did not dispute he was the shooter. Johnson instead claimed he was less culpable because he acted either recklessly or under sudden heat. Among the State's witnesses was Michael Biggs ("Biggs"), a crime scene investigator with the Indiana State Police who testified he was not a firearms analyst. The State questioned Biggs about the size of the apartment, at which point Biggs referred to handwritten notes. Johnson asked to review those notes, which led to a hearing outside the presence of the jury. At the hearing, Johnson elicited testimony that Biggs had not given his field notes to the State. Biggs also testified the measurements in those notes "were all included in a 3-D scanner document" that was provided to the State. Tr. Vol. III at 78. The State asserted it had provided that other document to the defense. Johnson moved to strike Biggs's testimony, claiming the defense had not received the notes. The court denied the motion, offering instead to recess and give Johnson time to review the notes. Johnson declined. He asked for a copy of the notes and said the defense was "ready to continue on." *Id.* at 86. During its examination of Biggs, the State asked about the

---

[5] I.C. § 35-42-1-1.

number of shots fired toward Adams and where the shooter was standing when firing the fatal shot. Johnson objected to these lines of questioning, claiming a lack of foundation. The court overruled the objections. Biggs testified only one bullet and shell casing had been found outside. He opined Johnson fired at least two shots at Adams, reasoning that the location of the recovered bullet was "not consistent with the position from which" a bullet would have exited Adams's body. *Id.* at 61. Biggs also opined it was not possible to have fired the fatal gunshot from a certain position inside of the apartment.

[10] The jury was instructed on the charged offenses, along with lesser offenses of Voluntary Manslaughter and Reckless Homicide. At the conclusion of the guilt phase, the jury found Johnson guilty as charged, and Johnson waived his right to have a jury consider the alleged enhancement. The judge later determined Johnson was a habitual offender. A sentencing hearing was held in early 2019, at which the trial court merged each Murder While Committing Robbery count with the corresponding Murder count, leaving two counts of Murder (Counts IV and V) and one count of Attempted Murder (Count III). The trial court sentenced Johnson to sixty years for each count of Murder, then applied a fifteen-year enhancement to Count IV. As to the count of Attempted Murder, the trial court imposed a sentence of thirty-five years. The trial court ordered consecutive sentences, resulting in an aggregate sentence of 170 years in the Indiana Department of Correction. The trial court also ordered Johnson to pay $2,413.71 in restitution, a figure mentioned in a presentence investigation report ("PSI") and a sentencing memorandum from the State.

[11]     Johnson now appeals.

# Discussion and Decision

## Evidentiary Matters

### Motion to Strike

[12]     Johnson challenges the denial of his motion to strike, arguing the State ran afoul of its discovery obligations by failing to timely disclose the handwritten notes. Courts have "wide discretion in ruling on violations of a discovery order," and we will reverse only upon an abuse of discretion. *Jenkins v. State*, 627 N.E.2d 789, 799 (Ind. 1993). In general, excluding evidence as a discovery sanction is proper only upon a showing "the State engaged in deliberate or other reprehensible conduct that prevents the defendant from receiving a fair trial." *Taylor v. State*, 676 N.E.2d 1044, 1046 (Ind. 1997). Instead of excluding evidence, "an order compelling disclosure and a continuance are generally the appropriate remedies." *Stark v. State*, 489 N.E.2d 43, 46 (Ind. 1986).

[13]     The State disputes its discovery obligations extended to Biggs's handwritten notes. Nevertheless, assuming *arguendo* the notes fell within the State's discovery obligations, Johnson has failed to demonstrate the State engaged in deliberate or reprehensible conduct that prejudiced him.

[14]     At trial, it was undisputed the prosecution was unaware of the notes, which Biggs had not provided. On appeal, Johnson argues Biggs was an employee of the State and we should not condone his failure to turn over the notes.

However, even assuming non-disclosure was in bad faith, Johnson fails to demonstrate how the late disclosure prevented him from receiving a fair trial. Indeed, Biggs testified his notes contained measurements he had taken of the crime scene. Biggs took those measurements as a precaution, in case there was a malfunction with a scanner used to take measurements. Biggs claimed his report—which the defense did not dispute receiving—contained measurements from the scanner that overlapped with his own. It is conceivable there were differences between the report and the notes—and the court offered to recess so Johnson could review the documents. However, Johnson declined. Moreover, in cross-examining Biggs, Johnson did not identify information in the notes that was not in the report. He has also failed to identify any discrepancy on appeal. Further, assuming Johnson had no warning of Biggs's opinion concerning the number of shots, Johnson nevertheless ably engaged in cross-examination on this issue—asking questions such as why the recovered bullet was deformed and whether Adams's spine could have changed the bullet trajectory. Ultimately, we cannot say the court abused its discretion by declining to strike all of Biggs's testimony. *See Beavers v. State*, 465 N.E.2d 1388, 1390 (Ind. 1984) (observing that granting a motion to strike is "a most severe sanction"). Indeed, Johnson was not prevented from receiving a fair trial as a result of the late disclosure.

## Foundation

[15] Johnson argues there was an insufficient foundation to admit Biggs's opinion that Johnson fired more than one shot at Adams. Johnson also challenges the admission of Biggs's opinion that it was not possible to fire the fatal shot at

Adams from a position inside the apartment, evidence that indicates Johnson followed Adams outside. Both lines of testimony bore on Johnson's claim of sudden heat. We review evidentiary rulings for an abuse of discretion, reversing "only when the decision is clearly against the logic and effect of the facts and circumstances." *Shinnock v. State*, 76 N.E.3d 841, 843 (Ind. 2017).

[16] Johnson claims—and the State does not dispute—the challenged testimony could not be admitted under Evidence Rule 702, which pertains to expert witnesses. The parties focus on whether this testimony was admissible under Rule 701, which provides as follows: "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; and (b) helpful to a clear understanding of the witness's testimony or to a determination of a fact in issue." The Indiana Supreme Court has explained that the term "perception" contemplates insight, intuition, or knowledge gained by direct use of one's senses, such as the sense of sight. *Kubsch v. State*, 784 N.E.2d 905, 922 (Ind. 2003). Furthermore, witnesses testifying under this rule "not only can testify about their observations, they can also testify to opinions or inferences that are based solely on facts within their own personal knowledge." *A.J.R. v. State*, 3 N.E.3d 1000, 1003 (Ind. Ct. App. 2014) (quoting *Hawkins v. State*, 884 N.E.2d 939, 944 (Ind. Ct. App. 2008)).

[17] Johnson asserts the testimony was not helpful because "the record contains no evidence that Biggs had any greater knowledge as to the ballistics issues on which he testified than the jurors who heard such evidence." Reply Br. at 11. However, so long as the testimony was rationally based on Biggs's perceptions,

we conclude the testimony—which related to the number of shots fired and the location of the shooter—was helpful to determining relevant factual matters.

[18] Johnson also claims Biggs was not present at the shooting and so his opinions could not be rationally based on his perceptions. We rejected a similar argument in *A.J.R.*—where an officer familiar with a crime scene opined about the direction of gunfire—and concluded the testimony was admissible under Evidence Rule 701. 3 N.E.3d at 1004. Here, Biggs was familiar with the layout of the crime scene, with knowledge about the locations of the victims and the recovered bullets. He also observed the wounds. Evidence Rule 701 permits Biggs to opine about matters rationally related to these kinds of perceptions, including the number of gunshots and the location of the shooter. We are not persuaded the court abused its discretion by admitting the testimony.[6]

## Sudden Heat

[19] Murder is the knowing or intentional killing of another human. *See* I.C. § 35-42-1-1. "The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder . . . to voluntary manslaughter." I.C. § 35-42-1-3. "Sudden heat exists when a defendant is 'provoked by anger, rage, resentment, or terror, to a degree sufficient to obscure the reason of an ordinary person,

---

[6] Because the testimony was rationally based on Biggs's perceptions, we disagree with Johnson's assertion that the testimony was merely speculative. Further, to the extent Johnson is challenging the basis for the opinion about the number of shots, his arguments go to the weight of the evidence—not its admissibility.

prevent deliberation and premeditation, and render the defendant incapable of cool reflection.'" *Brantley v. State*, 91 N.E.3d 566, 572 (Ind. 2018) (quoting *Isom v. State*, 31 N.E.3d 469, 486 (Ind. 2015), *cert. denied*). The State must prove beyond a reasonable doubt the defendant committed the elements of Murder. *See* I.C. 35-41-4-1; *Brantley*, 91 N.E.3d at 572. Where there is evidence of sudden heat, the defendant may obtain a jury instruction on voluntary manslaughter. *Brantley*, 91 N.E.3d at 572. At that point, the State "bears the burden of negating the presence of sudden heat beyond a reasonable doubt." *Evans v. State*, 727 N.E.2d 1072, 1077 (Ind. 2000). The State meets this burden "by rebutting the defendant's evidence or affirmatively showing in its case-in-chief that the defendant was not acting in sudden heat." *Id.*

[20] Johnson challenges the sufficiency of evidence negating sudden heat. Upon a sufficiency challenge, we do not reweigh evidence or judge witness credibility. *Brantley*, 91 N.E.3d at 570. We view the evidence in a light most favorable to the conviction, and will affirm if there is substantial probative evidence from which a reasonable fact-finder could find the defendant guilty beyond a reasonable doubt. *Davis v. State*, 743 N.E.2d 751, 753 (Ind. 2001).

[21] Johnson focuses on evidence favorable to him, asserting he was "in a drug-fueled rage" and the events in the apartment were "chaotic." Br. of Appellant at 37. However, it is undisputed Johnson became angry about a purse. Even after a relatively long drive afforded Johnson an opportunity to gather his thoughts, he rushed into the apartment and brandished a gun. It was Johnson who created a chaotic atmosphere. Moreover, even if Johnson was startled

when Adams emerged from a bedroom, there was evidence Johnson followed Adams outside of the apartment. Enough time passed for Adams to plead for his life and leap over a railing. There was evidence Johnson fired two shots at Adams, shooting him in the back when Adams was a considerable distance away and posed no threat to Johnson. Moreover, Johnson did not stop there. He turned his attention to those inside the apartment, shooting a crouching Feldstein in the back of her head, then firing the gun at Brown.

[22] We identify ample evidence from which a reasonable jury could determine, beyond a reasonable doubt, that Johnson was not rendered incapable of cool reflection when he committed Murder and Attempted Murder. Thus, the State met its burden of negating sudden heat, and we discern no failure of proof.

# Habitual Offender

[23] Johnson alleges insufficient evidence supports the habitual-offender sentence enhancement. When a person has been convicted of Murder, this enhancement is available if the State proves beyond a reasonable doubt the defendant has been convicted of two prior unrelated felonies, at least one of which was not a Level 6 felony or a Class D felony. I.C. § 35-50-2-8(b).

[24] To prove the existence of prior convictions beyond a reasonable doubt, the State must introduce certified and authenticated records of the convictions. *See Dexter v. State*, 959 N.E.2d 235, 238 (Ind. 2012). The State must also introduce "additional supporting evidence . . . to prove the identity of the defendant." *Id.*

That evidence "may be circumstantial." *Schlomer v. State*, 580 N.E.2d 950, 958 (Ind. 1991). "If the evidence yields logical and reasonable inferences from which the finder of fact may determine beyond a reasonable doubt that it was a defendant who was convicted of the prior felony, then a sufficient connection has been shown." *Hernandez v. State*, 716 N.E.2d 948, 953 (Ind. 1999).

[25] Here, the State introduced certified and authenticated records of convictions from Cause No. 02D04-0409-FD-723 and Cause No. 02D04-0907-FB-127. The records were for an offender named Michael J. Johnson and showed a Class B felony conviction for Robbery in 2009 along with Class D felony convictions for Auto Theft and Resisting Law Enforcement in 2005. The State also introduced a packet of documents from the Indiana Department of Correction, drawn from a certain record number related to a Michael Johnson. The packet refers to both causes. It also contains two photographs showing the face of a man. Below the photographs are the same record number and the name Michael Johnson. The State also elicited testimony from a detective who compared a photograph in the packet with Johnson's in-court appearance. The detective testified the photograph looked like Johnson, and that the photograph was a way the detective identified Johnson in connection with the criminal record.

[26] Johnson points out the records do not show a birthdate or a Social Security Number, and he claims there are height and weight discrepancies. Johnson also asserts the State did not introduce other evidence that might have been helpful, such as evidence of his prior addresses or "testimony indicating Johnson's fingerprints matched the fingerprints" contained in the packet. Br. of

Appellant at 43.  However, in light of the identification of Johnson in the photograph—and the connection between the photograph and the two certified convictions—we conclude there is sufficient evidence from which a reasonable fact-finder could determine, beyond a reasonable doubt, Johnson had the status of a habitual offender.  *Cf. Schlomer*, 580 N.E.2d at 958 (identifying sufficient evidence of a prior conviction where a witness had filed a prior charge, "viewed a photograph" of that prior offender, and "identified appellant in court").

## Inappropriate Sentence

[27]     We have authority to revise a sentence that "is inappropriate in light of the nature of the offense and the character of the offender."  Ind. Appellate Rule 7(B); *see* Ind. Const art. VII, § 6.  Our role is to "leaven the outliers," *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008), and we reserve appellate revision "for exceptional cases."  *Livingston v. State*, 113 N.E.3d 611, 613 (Ind. 2018).

[28]     Here, the court imposed an aggregate sentence length of 170 years—*i.e.*, sixty years for each Murder conviction, thirty-five years for Level 1 felony Attempted Murder, and a fifteen-year enhancement—which is within the statutory range. *See* I.C. § 35-50-2-3 (providing a sentencing range for Murder between forty-five years and sixty-five years, with an advisory sentence of fifty-five years); I.C. § 35-50-2-4(b) (providing a sentencing range for a Level 1 felony between twenty years and forty years with an advisory sentence of thirty years); I.C. § 35-50-2-8 (providing an enhancement range of six years to twenty years for a habitual

offender convicted of Murder); I.C. § 35-50-1-2 (authorizing consecutive sentences for crimes of violence, including Murder and Attempted Murder).

[29] As to the nature of the offenses, Johnson murdered two people and attempted to murder a third person after becoming angry about the location of a purse. Johnson—previously convicted of a serious violent felony—committed the offenses with a gun that was illegal for him to possess. Moreover, Johnson was on parole when he used methamphetamine, armed himself, committed these crimes, and evaded law enforcement during a dangerous, high-speed chase.

[30] The circumstances of the crimes and the flight thereafter—including leaving Feldstein to die and running past Adams's body—do not reflect well on Johnson's character. As to his character, we are not unmindful of evidence Johnson had a difficult childhood, which included being exposed to violence, drug use, and drug dealing. Moreover, Johnson cooperated with the police after his eventual arrest. It also appears Johnson has struggled with substance abuse—and his decision to consume methamphetamine might have played some part in his conduct. The trial court took note of these potential mitigating circumstances when selecting its sentence. We also note Johnson expressed remorse, and there is evidence he has several mental-health diagnoses. Johnson also points out he has a young child, has overcome academic hardships, and has previously maintained employment.

[31] Nevertheless, Johnson—thirty-five years old when he committed the offenses— has had many encounters with law enforcement, with opportunities to address

his mental health and his issues with substance abuse. By the time he committed these offenses, Johnson had amassed six felony convictions, including convictions of Burglary, Robbery, and Unlawful Possession of a Firearm by a Serious Violent Felon. Moreover, Johnson has been afforded leniency in the past, including receiving a sentence modification and the opportunity to participate in a transition program. However, Johnson violated the conditions of re-entry programming. He committed the instant offenses even after receiving a twenty-year sentence for Robbery, serving time, and having the opportunity to re-enter society through the privilege of parole.

[32]   Johnson asks us to revise his sentence to an aggregate length of seventy years, removing 100 years from the sentence imposed by the trial court. However, after considering the nature of the offenses and the character of the offender, we are not persuaded of exceptional circumstances that would warrant disturbing the decision of the trial court. We conclude the sentence is not inappropriate.

# Restitution

[33]   A court may order restitution for damage "incurred as a result of the crime." I.C. § 35-50-5-3(a)(1). The amount of loss "is a factual matter" that "can be determined only upon presentation of evidence." *Smith v. State*, 471 N.E.2d 1245, 1248 (Ind. 1984), *trans. denied*. We review a restitution order for an abuse of discretion, which occurs "if no evidence or reasonable inferences therefrom" support the order. *Archer v. State*, 81 N.E.3d 212, 216 (Ind. 2017) (emphasis removed) (quoting *Little v. State*, 839 N.E.2d 807, 809 (Ind. Ct. App. 2005)).

[34] Here, the trial court ordered Johnson to pay $2,413.71 for property damage. The PSI cursorily mentions that figure under the Victim Impact section of the form: "The Victim Impact Statement was sent to the victim(s) and/or personal representative, however, a response has not been received. According to the Prosecutor's Office, Riverside Villa Apartments has requested $2,413.71 in restitution." App. Vol. II at 224. This figure also appears in a sentencing memorandum the State filed, which notes "the State requests restitution in the amount of two thousand four hundred thirteen dollars and seventy-one cents ($2,413.71[]) to the Riverside Villa Apartments, LP. (See Attached)." App. Vol. III at 27. Although the sentencing memorandum purports to reference an attachment, the document contained in the Appendix does not include an attachment. Moreover, the State asserts on appeal that "the State's Sentencing Memorandum was filed without the attachment." Br. of Appellee at 46 n.4.

[35] Johnson claims the amount of restitution is not supported by evidence, and the State—apart from noting the figure is in the documents—does not argue the merits. Instead, the State asserts Johnson waived this challenge by failing to object to the restitution request or to the amount mentioned in the PSI. However, as Johnson points out, an unsupported restitution order is a type of sentencing error that a defendant may raise for the first time on appeal. *See, e.g.*, *Rich v. State*, 890 N.E.2d 44, 48-49 (Ind. Ct. App. 2008), *trans. denied*.

[36] We conclude there is insufficient evidence supporting the amount of restitution, and we therefore reverse the restitution order. Anticipating possible reversal, the State asks that we remand for a new restitution hearing—a practice

endorsed by the Indiana Supreme Court. *See Iltzsch v. State*, 981 N.E.2d 55, 57 (Ind. 2013) (per curiam) ("[P]recedent supports remanding for additional evidence when appropriate."). Therefore, we remand solely for an evidentiary hearing on the issue of restitution.

# Conclusion

[37] We affirm the convictions and the sentences imposed thereon but remand for an evidentiary hearing on the issue of restitution.

[38] Affirmed in part, reversed in part, and remanded.

Najam, J., and May, J., concur.